IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA      :      CRIMINAL ACTION
                              :      NO. 07-75-1
          v.                  :
                              :      CIVIL ACTION
JOHN NAPOLI                    :      NO. 11-6353

MEMORANDUM

Bartle, J.                                    September 26, 2012

          Before the court is the timely pro se motion of
defendant John Napoli ("Napoli") to vacate, set aside, or correct
his sentence under 28 U.S.C. § 2255.

          Napoli was found guilty by a jury on October 4, 2007 of
conspiracy to distribute methamphetamine, in violation of 21
U.S.C. §§ 841(a)(1), (b)(1)(A) and 846 (Count I); two counts of
violent crimes in aid of racketeering ("VICAR") in violation of
18 U.S.C. § 1959(a)(3) (Counts II and IV); collection of credit
by extortionate means, in violation of 18 U.S.C. § 894 (Count V);
one count of possession of a firearm and ammunition by a
convicted felon, in violation of 18 U.S.C. § 922(g)(1) (Count
IX); two counts of possession of a firearm by a convicted felon,
in violation of 18 U.S.C. § 922(g)(1) (Counts X and XI); and
unlawful possession of a machine gun, in violation of 18 U.S.C.
§ 922(o) (Count XII).  The jury acquitted Napoli of one VICAR
count (Count III).  In responses to a special interrogatory, the
jury determined that Napoli conspired to distribute over 500
grams of crystal methamphetamine.  Napoli was sentenced on

April 16, 2008 to a term of 432 months of incarceration.[1]  The
Court of Appeals for the Third Circuit affirmed the judgment and
sentence on April 21, 2010.  See United States v. Heilman, 377 F.
App'x 157, 165 (3d Cir.  2010).  It issued its mandate on May 19,
2010.

Napoli now alleges in his § 2255 motion that he was
deprived of his Sixth Amendment right to effective assistance of
counsel through a series of errors made by his attorneys during
the trial and sentencing.  On May 18, 2012 and August 7, 2012,
the court held an evidentiary hearing limited to the issue of
whether Napoli's trial counsel failed to call certain witnesses
on Napoli's behalf.

I.

The underlying facts, in the light most favorable to
the government, are as follows.  Between January 2003 and June
2006, Napoli organized and led a racketeering enterprise, known
as the Pennsylvania Chapter of the Breed Motorcycle Gang
("Breed").  This organization, located in Bristol, Pennsylvania,
was a hierarchical motorcycle gang with a strict authoritarian
leadership.  As president of the Breed chapter, Napoli had the
ultimate authority over the Breed enterprise.  The Breed gang
trafficked 125 pounds of crystal methamphetamine over that three-
year period.

---

1.  The sentence also included a term of supervised release of
five years, forfeiture of specific tangible property, a special
assessment of $700, and joint and several forfeiture with his co-
defendants of $6 million.

From approximately March 2006 through June 2006, co-defendant William Johnson ("Johnson") became the principal supplier of methamphetamine to the Breed gang.  Napoli directed that the methamphetamine from Johnson be distributed to numerous mid-level distributors inside the Breed gang.

Within the Breed gang, violence was frequently used to ensure loyalty and compliance with orders from leadership.  A former Breed member, Christopher Quattrocchi ("Quattrocchi"), testified that in March 2003 Napoli and others participated in beating Thomas "Schnozz" Burke ("Burke") at Napoli's residence. Burke was a prospective member of the Breed, who several Breed members did not trust.  During the same evening, Burke urinated on the dining room wall of Napoli's home.  Napoli took out a drill with a Phillips head attachment and screwed it into Burke's arm.  Napoli later brutally beat Burke.  After the beating, Burke fell asleep while still wearing his Breed colors.  Quattrocchi testified that Napoli tried to set Burke on fire pursuant to a Breed tradition of setting on fire anyone who falls asleep wearing Breed colors, but Quattrocchi dissuaded Napoli from doing so because they were inside Napoli's residence.  Burke sustained a fractured eye-socket and facial bone, among other injuries.

On November 24, 2005, Napoli, Johnson, and Quattrocchi, along with other Breed members, brutally beat past Breed president James Graber based on Napoli's belief that Graber had stolen money from a game machine in the gang's clubhouse.  This organized assault and battery was formally approved by the "Breed

-3-

Executive Board" a week in advance.  The beating resulted in Graber spending four days in the intensive care unit of the hospital with damage to his back, head, liver, and spleen.

The government also produced evidence that Napoli stabbed a local bar patron in a fight when a bartender asked Breed members to leave a bar because the owners prohibited patrons from wearing motorcycle colors in their establishment.

As a result of the investigation of the Breed gang by the Pennsylvania State Police, the Pennsylvania Attorney General sought and obtained wiretaps for a phone used by Napoli.  The wiretap was authorized on May 3, 2006 and a thirty-day extension was signed on June 2, 2006.

On June 6, 2006, the Pennsylvania State Police searched Napoli's home.  The search recovered a Ruger Model nine millimeter pistol, loaded with fourteen rounds, a Kel-Tech Model nine millimeter pistol, loaded with eleven rounds, a separate magazine loaded with thirteen rounds, and other items pertaining to the Breed, including a computer containing records of Breed club laws, prospective laws, and funeral bylaws.  Cooperating witness Eric Loebsack ("Loebsack") testified at trial that Napoli directed him to remove firearms from the home of Robert Freudenberger, another member of the Breed, and store them in storage lockers registered to John Wilson, who was Loebsack's roommate.  Loebsack also testified that he rented the lockers in Wilson's name at Napoli's direction.

-4-

Co-defendants Napoli, Johnson, and Thomas Heilman were tried together during a twelve-day jury trial.  Napoli was represented by two attorneys at trial, Jack McMahon and Arnold Joseph, and by a third attorney at his sentencing, Hope Lefeber.  The government called 35 civilian and law enforcement witnesses, including eight cooperating coconspirators who testified to Napoli's involvement in drug distribution as well as the Breed's drug financing and violent methods.

## II.

Napoli alleges in his § 2255 motion that he was deprived of his Sixth Amendment right to effective assistance of counsel as a result of 26 errors made by his counsel during trial and sentencing.  Under the Strickland standard, Napoli bears the burden of proving that:  (1) his counsel's performance was deficient; and (2) he suffered prejudice as a result.  Id.; United States v. Nino, 878 F.2d 101, 103 (3d Cir. 1989).  Our scrutiny of counsel's performance is highly deferential in that we presume counsel's actions were undertaken in accordance with professional standards and as part of a "sound trial strategy." Strickland, 466 U.S. at 689 (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)).

The first prong requires that "[counsel's] performance was, under all the circumstances, unreasonable under prevailing professional norms."  United States v. Day, 969 F.2d 39, 42 (3d Cir. 1992).  Under the second prong, Napoli must show "there is a reasonable probability that, but for counsel's unprofessional

-5-

errors, the result of the proceeding would have been different."
Id. at 694.  A "reasonable probability" is one that is
"sufficient to undermine confidence in the outcome."  Id.  When
ruling on a § 2255 motion, the court may address the prejudice
prong first "and reject an ineffectiveness claim solely on the
ground that the defendant was not prejudiced."  Rolan v. Vaughn,
445 F.3d 671, 678 (3d Cir. 2006).

III.

        We will address each of the errors Napoli alleges in
turn.  Napoli first contends that his trial attorneys were
ineffective because they failed to object to the closure of the
voir dire proceedings in the courtroom even though this closure
allegedly violated Napoli's Sixth Amendment rights to a public
trial.  For supporting evidence, Napoli has submitted affidavits
from his co-defendants and family members stating that they were
told by the judge to leave the courtroom for the duration of the
jury selection.  The affidavits all state that the court ordered
the courtroom doors to be closed and locked from the public until
the voir dire and jury selection process was over because the
courtroom was going to be packed with prospective jurors and
there would be no room for spectators.  In contrast, the
government contends that the courtroom was never closed or
locked, but rather that the court asked spectators to yield their
seats if there were not enough seats for the prospective jury
panel.  The court recalls the events in question and the

-6-

government's version is accurate.  The court never ordered that the doors be locked or anyone excluded from the courtroom.

"Not every courtroom closure deprives a defendant of the right to a public trial under the Sixth Amendment." Morales v. United States, 294 F. Supp. 2d 174, 178 (D. Conn. 2003) (citing Peterson v. Williams, 85 F.3d 39, 42 (2d Cir. 1996)).  In Morales, similarly to the situation here, the courtroom was closed during jury selection because there was not sufficient space in the gallery for both prospective jurors and spectators. In a petition under 28 U.S.C. § 2255, the defendant argued that this closure violated his Sixth Amendment rights to a public trial.  The court found that reserving the gallery to accommodate the prospective jurors was well within the discretion of the court to "keep order in the courtroom, and to proceed fairly and efficiently." Id. (citing Press-Enterprise Co. v. Superior Court of California, 464 U.S. 501, 512 (1984)).  The Morales court reasoned:

> Morales was tried with many other
> co-defendants. Had the court allowed
> spectators to sit among the panel of
> potential jurors, an already complicated
> situation would have quickly become more
> confusing and problematic.  Certainly, the
> parties' exercise of peremptory strikes would
> have been hindered by allowing spectators to
> co-mingle with the prospective jurors.  There
> is also always the fear of juror
> contamination, particularly in high-profile
> criminal cases such as Morales's.

Id.  The situation here was the same:  a high-profile criminal case with multiple defendants.  The panel of prospective jurors

-7-

in this case was unusually large, consisting of 100 individuals. They completely filled the courtroom seats reserved for spectators.  As in Morales, allowing spectators to sit among prospective jurors would have been "confusing and problematic." It was proper for the court to ask spectators to give their seats to prospective jurors, and accordingly any objection by Napoli's counsel would have been futile.

Napoli next alleges that his trial attorneys were ineffective for failing to call witnesses who would have testified in his favor.  Under Strickland, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."  Strickland, 466 U.S. at 691.  The decision of whether to interview and call a particular witnesses is generally a strategic choice made by counsel and is entitled to a "heavy measure of deference." Strickland, 466 U.S. at 690-91.  As our Court of Appeals has stated, "trial counsel [is] not bound by an inflexible constitutional command to interview every possible witness. Instead, counsel [is] simply required to exercise reasonable professional judgment in deciding whether to interview" a potential witness.  Lewis v. Mazurkiewicz, 915 F.2d 106, 113 (3d Cir. 1990).  To rise to the level of ineffective assistance of counsel, there must be a clear showing that the testimony would have been material and favorable.  Id.; see also United States v. Gray, 878 F.2d 702, 711 (3d Cir. 1989).

-8-

The witnesses Napoli contends in his brief that his counsel should have called were Alissa Fischer ("Fischer"), Brian Jones, Michael Barowsky, Ronnie Koon ("Koon"), James Chester, Robert Freudenberger ("Freudenberger"), and Saidy Kinney ("Kinney").  He maintains that the outcome fo the trial would have been different had they testified.  Napoli provided affidavits from these witnesses.  A two-day evidentiary hearing was held on this issue, at which a number of witnesses testified. They were Napoli, Kinney, Freudenberger, Koon, Marie Kunkel ("Kunkel"), Maureen Dunne ("Dunne"), and Paul M. Shive, also known as Mike ("Shive").  His trial attorneys Jack McMahon ("McMahon") and Arnold Joseph ("Joseph) also took the stand.

Napoli initially hired Joseph to file pretrial motions on issues involving the wiretap, but Joseph stayed on during trial.  Joseph was second chair of the trial while McMahon occupied the first chair.  Of the two, McMahon was the final decision maker.

Napoli testified at the hearing that he gave McMahon a list of witnesses to call, many of whom McMahon did not present. Napoli stated that Kinney, his girlfriend and mother of his child, would have been able to testify that the firearms found in their bedroom were hers alone, and Napoli did not have access to them.  Kinney also would have testified that Napoli's beating of Burke was due to a personal matter because Burke urinated in front of her in their dining room and unrelated to any racketeering activity of the Breed.  When Kinney took the stand,

-9-

she confirmed that she would have testified as Napoli stated.
However, McMahon testified at the hearing that he never
considered calling Kinney as a witness at Napoli's trial because
of her relationship with Napoli and because he believed that any
testimony from her that Napoli did not sell drugs, that he earned
money from legit businesses, and that he did not have access to
the guns in their home would not have been credible.  This was
sound trial strategy, and McMahon was not ineffective for
declining to call Kinney.  Even if McMahon erred, no prejudice
occurred under <u>Strickland</u> in light of the overwhelming evidence
against Napoli.

Napoli also stated that he wanted McMahon to call
Kunkel, Dunne, and Shive to testify that they were his
construction customers.  These three witnesses confirmed at the
hearing that they used Napoli's construction services and paid
him for those services.  Kunkel testified that she paid Napoli
$10,000 to $12,000 in 2001 and $600 to $800 at a later date.
Dunne testified that while she paid $45,000 in total in 2005 for
construction at her home, she paid $38,000 of this amount to
Grady, Napoli's business partner at the time, and only $7,000 to
Napoli.  Shive testified that he paid $47,208 in total in 2005,
some to Grady.  Napoli argues that this evidence would have
tended to persuade the jury of his innocence by accounting for
some of the cash that was seized in the various searches.  We
disagree.  At best, they could only account for at most $105,008
of the $224,000 in cash belonging to Napoli which was seized in

the investigation of this case in June 2006.  Further, some of the cash paid to him for construction services was paid long before the seizure of the cash in this case, and some was paid to Grady, not to Napoli.  By only accounting for some of the cash, this evidence only calls attention to the additional, unaccounted-for cash.  Napoli was not prejudiced under Strickland by the failure to call these witnesses.

Napoli also testified at the hearing that he wanted McMahon to call Freudenberger, who would have stated at trial that firearms seized from a storage bin were not connected to the Breed and never controlled by Napoli.  Upon taking the stand at the hearing, Freudenberger stated that he was the legal owner of firearms that he kept in a locked cabinet in his house until Quattrocchi and Loebsack moved the firearms to another location, but Napoli was not involved with the firearms.  Freudenberger's testimony at the hearing that Napoli had nothing to do with the firearms was not credible and is contradicted by the testimony of Quattrocchi and Loebsack.  Freudenberger also stated that he was at Napoli's home when Napoli beat Burke but that he did not see a drill, whereas Napoli himself admitted at the hearing to drilling Burke in the arm.  It was proper for McMahon to decline to call such an incredible witness.

Napoli further stated on the witness stand that he urged McMahon to call Fischer, the wife of Kenneth Steinmuller ("Steinmuller"), who purportedly would have testified that Steinmuller told her that he intended to blame Napoli for the

-11-

drugs and firearms found at their residence even though Napoli never brought over drugs.  Fischer did not testify at the hearing.  Without hearing from Fischer, we afford her affidavit no weight.  Furthermore, the alleged purpose of Fischer's testimony would have been to impeach Steinmuller.  However, Steinmuller never testified at trial.

In addition, Napoli testified that Koon, the Treasurer of the Breed, should have been called to testify at the trial, as he did in front of the grand jury, that the purpose of the Breed organization was not to deal methamphetamine.  Koon did not appear as a witness at the hearing due to his poor health, but his grand jury testimony was admitted as evidence.  Napoli further stated that Michael Barowsky and James Chester, long time members of the Breed, would have testified to the same effect as Koon.  McMahon did not want to call any of these witnesses because the issue at trial was not what the bylaws of the Breed stated, or the historical purpose of the organization, but rather whether illegality and violence occurred nonetheless.  There was nothing prejudicial about the failure to seek to introduce irrelevant or tangential proof.

Napoli has failed to show that he was prejudiced under Strickland by counsel's failure to interview these witnesses because their testimony either would not have been material or would have been insufficient to raise a reasonable probability that the result in the case would have been different. Strickland, 466 U.S. at 694.  Counsel cannot be deemed

-12-

ineffective for failing to call a witness where there is good reason to question the witness's credibility and the witness would be vulnerable to cross-examination on damaging evidence. See, e.g., McAleese v. Mazurkiewicz, 1 F.3d 159, 167-70 (3d Cir. 1993).

Napoli's next contention is that his trial attorneys failed to contest the testimony of Agent Kirk Schwartz as violating Rules 701, 702, 703, and 403 of the Federal Rules of Evidence. Schwartz was employed in the Bureau of Narcotics Investigation and Drug Control in the Office of the Pennsylvania Attorney General and had taken the affidavit in support of the wiretap of Napoli's phone in 2006. First, Napoli contends that Agent Schwartz's testimony impermissibly provided a summary of evidence not yet presented to the jury. It is proper for a witness who is a law enforcement official to testify at the start of trial to the "story of... [the] investigation" but not for such a witness to tell "the story of the conspiracy according to the Government." See United States v. Figaro, 126 F. App'x 75, 78 (3d Cir. 2005). Here, Schwartz properly testified about the steps taken during the investigation. Witnesses "generally should be allowed to explain the context in which they act." Id. (quoting United States v. Sallins, 993 F.2d 344, 346 (3d Cir. 1993)). Schwartz did so by testifying about several undercover drug purchases, surveillance activities, "colors" worn by the Breed, the location of Breed chapters, the wiretaps and search warrants that were used, and how cooperating coconspirators

showed agents lockers containing physical evidence.  Schwartz
also identified the parties speaking on each wiretap tape.  None
of this testimony impermissibly told the story of the conspiracy.
Accordingly, any objection by Napoli's trial counsel would have
been futile.

Napoli also argues that Schwartz's role as both a fact
and an expert witness "conferred an aura of special reliability
and trustworthiness" on Schwartz's testimony.  While our Court of
Appeals has not squarely addressed this issue, another circuit
has noted that "the use of the case agent as an expert increases
the likelihood that inadmissible and prejudicial testimony will
be proffered." United States v. Dukagjini, 326 F.3d 45, 53 (2d
Cir. 2002).  The Second Circuit explained that three different
problems may arise when a case agent testifies as both an expert
and a lay witness.  Id.  Despite potential problems that may
arise when a case agent testifies as both an expert and a lay
witnesses, the same court still noted that such testimony is
permitted.  Id. at 56.

The first potential problem is, as Schwartz argues,
that the witness's expertise may confer upon him an "aura of
special responsibility and trustworthiness." Id. at 53.  Here,
even if such a aura existed, Schwartz's testimony was
corroborated by eight coconspirators, and no Strickland prejudice
occurred.

The second potential problem is that "expert testimony
by a fact witness or case agent can inhibit cross-examination."

Id.  Indeed, Napoli contends that his trial counsel was forced to
engage in a "delicate" cross-examination of Schwartz because of
his elevated expert status.  However, Napoli does not reference
any specifics, and we do not find that the cross-examination was
ineffective.

The third potential problem when a case agent testifies
as both a fact witness and an expert is that "there is an
increased danger that the expert testimony will stray from
applying reliable methodology and convey to the jury the
witness's 'sweeping conclusions'" about the defendants'
activities.  Id.  However, the Dukagjini court explained that it
is the district court's responsibility to avoid any such
potential errors "by being vigilant gatekeepers of such expert
testimony to ensure that it is reliable."  Here, Napoli does not
point to specific testimony that was unreliable.  Nor do we find
any unreliable testimony in the record.  No prejudice occurred.

Napoli then contends that his counsel erred by not
objecting when the court stated that Schwartz qualified as an
expert in narcotics and code language in front of the jury.
Napoli contends that Schwartz should have been qualified as an
expert outside of the presence of the jury because the court may
have appeared to endorse Schwartz by stating in front of the jury
that he was permitted to testify as an expert.  Rule 103 of the
Federal Rules of Evidence provides:

> The court must conduct any hearing on a
> preliminary question so that the jury cannot
> hear it if:

-15-

> (1) the hearing involves the admissibility of a
> confession;
> (2) a defendant in a criminal case is a witness and so
> requests; or
> (3) justice so requires.

Fed. R. Evid. 103.  Here, none of those circumstances was
present.  At least one court outside of this circuit has
disapproved of counsel performing voir dire of an expert witness
in the presence of the jury.  See United States v. Johnson, 488
F.3d 690, 697 (6th Cir. 2007).  That said, the cases which Napoli
cites from within this circuit do not prohibit a court from
qualifying an expert in the presence of the jury.  See Schneider
v. Fried, 320 F.3d 396, 404 (3d Cir. 2003); Bruno v. Merv
Griffin's Resorts Int'l Casino Hotel, 37 F. Supp. 2d 395, 398
(E.D. Pa. 1999).  Moreover, the government offered to conduct the
voir dire outside the presence of the jury, but Napoli's counsel
stated that voir dire typically occurred in front of a jury and
so should in this case.  This accordingly appears to have been a
strategic decision of counsel.

    In addition, other courts to address this issue have
found that voir dire of an expert's qualifications may take place
either in the presence or absence of the jury, at the discretion
of the court.  See United States v. Nacchio, 555 F.3d 1234, 1245
n.10 (10th Cir. 2009).  Furthermore, the Supreme Court has
emphasized that the law governing expert testimony "grants a
district court the same broad latitude when it decides how to
determine reliability as it enjoys in respect to its ultimate
reliability determination."  Kumho Tire Co. v. Carmichael, 526

-16-

U.S. 137, 142 (1999).  We conclude that Napoli was not prejudiced under <u>Strickland</u> when Schwartz was approved as an expert in the presence of the jury.

Napoli also argues that Schwartz was only qualified as an expert in interpreting drug language but that he also testified about interpreting ordinary language.  For example, Napoli contends it was improper for Schwartz to interpret "something" to mean "methamphetamine" and "I have other stuff I gotta get rid of" to mean that the person on the recording "had money she wanted to give to Mr. Napoli but he was away."  Under Rule 702 of the Federal Rules of Evidence, a court may admit expert opinion evidence if "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue."  Furthermore, "it is well established that experienced government agents may testify to the meaning of coded drug language under [Rule] 702."  <u>United States v. Terrence Gibbs</u>, 190 F.3d 188, 211 (3d Cir. 1999).  In <u>Terrence Gibbs</u>, our Court of Appeals determined that expert testimony should be excluded if law enforcement agents testify to coded or code-like language used by defendants if such language is clear and thus the expert testimony is not helpful to the jury.  That is not what occurred here.  Schwartz's testimony was necessary to interpret the ambiguous and coded words used in the recorded conversations and thus to help the jury understand the evidence.  Thus, although the words he interpreted were not necessarily drug jargon, his

expertise was still required.  Again, Napoli was not prejudiced under Strickland, 466 U.S. at 694.

Napoli additionally maintains that Schwartz's expert testimony was unreliable.  This argument is baseless.  As noted above, government agents "may testify to the meaning of coded drug language under [Rule] 702."  Terrence Gibbs, 190 F.3d at 211.  Schwartz was an experienced agent and his expert testimony about coded words was reliable.

Napoli further argues that Schwartz testified as to his mindset and also made conclusory statements about Napoli's culpability.  Napoli specifically alleges that when Schwartz stated that a "pattern was developing" between Napoli, Johnson, Traverse, and Loebsack, he was describing the conspiracy existing only in Napoli's mind.  No ineffective assistance of counsel occurred because Napoli's trial counsel objected to Schwartz's use of the word "pattern" at the trial, and it was overruled. Accordingly, counsel was not ineffective.  This testimony was also not a conclusory statement about Napoli's culpability. Under Rule 704(b) of the Federal Rules of Evidence, "an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone"  Fed. R. Evid. 704(b).  A "pattern" is not a mental state or condition constituting an element of any crime charged against Napoli or any defense.  Accordingly, Rule 704(b) was not implicated.

-18-

Napoli also alleges that Schwartz testified as to Napoli's state of mind when he stated, "it became apparent ... that Mr. Johnson was waiting on a delivery of methamphetamine," and when asked to interpret coconspirator Johnson's phrase, "I got something for you anyway," Schwartz testified, "Mr. Johnson wants to give Mr. Napoli the money he collected."  None of these statements relates to Napoli's state of mind, and Schwartz's testimony did not violate Rule 704(b).  Napoli cites United States v. Watson, 260 F.3d 301, 309 for the proposition that law enforcement officers may not testify about defendants' intent. However, in that case our Court of Appeals emphasized that the prosecutor erred by eliciting expert testimony regarding the defendant's intent.  Here, the government did not ask Schwartz about Napoli's intent.  Rather, Schwartz was merely interpreting what Johnson said.  No prejudice took place.  Strickland, 466 U.S. at 694.

Napoli's next argument is that his trial counsel was ineffective for failing to show that evidence obtained from wiretap surveillance was inadmissible.  As part of this argument, Napoli first contends that his trial counsel failed to object to untimely sealing of the recordings of the intercepted conversations.  The wiretap of Napoli's telephone ended on June 13, 2006, and a sealing order was signed on June 15, 2006 by Judge Jack A. Panella of the Superior Court of Pennsylvania, who supervised the wiretap investigation.  Any delay between June 13, 2006 and June 15, 2006 was reasonable under the requirements of

18 U.S.C. § 2518(8)(a), which requires that "[i]mmediately upon the expiration of the period of the order, or extensions thereof, such recordings shall be made available to the judge issuing such order and sealed under his directions."  18 U.S.C. § 2518(8)(a). The statute also provides that "[t]he presence of the seal provided for by this subsection, or a <u>satisfactory explanation</u> for the absence thereof, shall be a prerequisite for the use or disclosure of the contents of any wire, oral, or electronic communication or evidence derived therefrom."  <u>Id.</u> (emphasis added).  The Supreme Court has found that this exclusionary remedy also applies if the seal was not timely applied.  <u>See</u> <u>United States v. Ojeda Rios</u>, 495 U.S. 257, 263 (1990).  The disk was "removed, sealed, signed for and submitted to the Superior Court" on June 13, 2006, and the government has represented that Judge Panella was out of town on court business on that day and signed the order when he returned at 4pm on June 15, 2006.  Here there was an objectively reasonable "satisfactory explanation."

        In <u>United States v. Carson</u>, our Court of Appeals held that two kinds of delays are "satisfactory" under § 2518(8)(a). 969 F.2d 1480, 1488 (3d Cir. 1992).  The first was "the relatively short delays necessitated by the process required to comply with the provisions of the Act; administrative delays for want of a better term."  <u>Id</u>.  The second was longer delays attributable to "understandable mistakes of law and interference from unexpected, extrinsic events beyond the government's control."  <u>Id</u>.  Here, the first type of delay occurred.  It is

understandable that Judge Panella was away for two days and
unable to sign a sealing order.  Thus, if Napoli's counsel had
moved to suppress the tapes on this basis, he would not have been
successful.

          In his list of alleged <u>Strickland</u> violations, Napoli
maintains that the wiretap application did not demonstrate that
the wiretap was "necessary" under 18 U.S.C. § 2518 and that his
counsel was ineffective for not revealing this lack of necessity.
To obtain a wiretap, "[t]he Government does not have a great
burden in proving necessity, because it need not prove to a
certainty that normal investigative techniques will not succeed,
but rather it needs only to show that such techniques reasonably
appear to be unlikely to succeed if tried."  <u>Heilman</u>, 377 F.
App'x at 186 (internal citations omitted).  In each affidavit in
support of the wiretap application, Agent Schwartz included a
section entitled "Need for Interception" to explain why wiretap
interception was necessary and why normal investigative tools
precluded law enforcement from obtaining sufficient evidence to
prosecute. Within Napoli's necessity argument, two of his sub-
arguments were addressed by our Court of Appeals in Napoli's
direct appeal.  These were first, that the government used the
necessity statement from the wiretap application of Johnson,
Napoli's co-defendant, to establish that necessity existed to
obtain Napoli's wiretap, and, second, that the necessity section
in the application for Johnson's wiretap was composed of
boilerplate language.  The Court of Appeals concluded that the

affidavits did not rely on boilerplate recitations but rather
contained "detailed descriptions" of why traditional
"investigatory tools would be insufficient in this case."
Heilman, 377 F. App'x at 186 (emphasis in original).  The court
also agreed that "the wiretap affidavits for Johnson's second
phone and Napoli's phone are virtually the same."  It explained
that Napoli's argument on this point "misses the mark" because
the two wiretap applications were part of the same investigation
and thus the evidence referenced to establish necessity was very
similar.  See id. at 190.

        Napoli made two additional arguments in his § 2255
motion regarding this necessity issue.  The first was that his
trial counsel did not understand the wiretap law, including that
the standard for obtaining a wiretap is one of necessity and not
probable cause, and the second was that his counsel erred by not
objecting to the court's application of Franks v. Delaware, 438
U.S. 154 (1978) and United States v. Leon, 468 U.S. 897 (1984) in
denying Napoli's motion to suppress.

        In Franks v. Delaware, the Supreme Court determined
that a criminal defendant has the right to challenge the
truthfulness of factual statements made in an affidavit of
probable cause supporting a warrant if he can make a "substantial
preliminary showing that a false statement knowingly and
intentionally, or with reckless disregard for the truth, was
included by the affiant in the warrant affidavit, and if the
allegedly false statement is necessary to the finding of probable

-22-

cause." 438 U.S. at 155-56.  Our Court of Appeals concluded that Napoli failed to make this preliminary showing.  _Heilman_, 377 F. App'x at 178.

In _United States v. Leon_, on which Napoli relies, the Supreme Court held that the exclusionary rule did not prohibit the admission of evidence seized in reasonable, good-faith reliance on a search warrant, even if the warrant was subsequently found to be defective.  468 U.S. at 918.  Our Court of Appeals has never addressed whether the good faith exception of _Leon_ applies to wiretaps, but other circuits are split on this issue.  _See_ _Heilman_, 377 F. App'x at 185 n.21 (citing _United States v. Rice_, 478 F.3d 704, 711-12 (6th Cir. 2007); _United States v. Moore_, 41 F.3d 370, 376 (8th Cir. 1994), _United States v. Malekzadeh_, 855 F.2d 1492, 1497 (11th Cir. 1988); _United States v. Vest_, 842 F.2d 1319, 1334 (1st Cir. 1988)).

Napoli brought up essentially the same issues in his appeal, although not under the ineffective assistance of counsel mantra.  Our Court of Appeals found that the District Court addressed both whether the affidavits supported probable cause and whether they established necessity to conduct the wiretaps. It recognized that the district court did not and had no need to analyze the good faith exception of _Leon_ in its conclusion that the wiretaps were necessary.  _See_ _Heilman_, 377 F. App'x at 190. Accordingly, any objection by Napoli's trial counsel to the district court's application of _Leon_ would have failed.

Regarding the application of <u>Franks</u> by the district court, our Court of Appeals found that Napoli's reading of 18 U.S.C. § 3504 as mandating a necessity hearing separate from a <u>Franks</u> hearing was "completely divorced from a plain reading of the text." <u>Id.</u> at 184.  Napoli also addresses this same issue in his contention that his appellate counsel was ineffective because she argued in her opening brief that <u>Franks</u> was an appropriate standard but then stated that <u>Franks</u> was inapplicable in her reply brief.  The Court of Appeals determined that <u>Franks</u> was the appropriate standard.  <u>Id.</u>  Accordingly, Napoli was not prejudiced by any failure of Napoli's attorneys to argue that <u>Franks</u> was inapplicable.

Napoli follows with the argument that his trial counsel failed to show that Schwartz materially misrepresented and overstated several key facts in his affidavit in support of his wiretap application.  He contends that Schwartz misstated that David Serviolo, an informant, would never be able to infiltrate the Breed and overstated that the Breed members showed heightened awareness of their surroundings.  As noted above, Serviolo made a series of controlled drug purchases during the investigation. Schwartz made these statements to show why a wiretap was necessary.

Our Court of Appeals also addressed this argument, and concluded that Napoli did not provide any evidence that Schwartz "misrepresented the usefulness of physical surveillance."  <u>See</u> <u>id.</u> at 182.  Nor does Napoli provide any such evidence in his

-24-

current motion.  He merely contends that Serviolo was invited to
join the Breed and therefore could have infiltrated the
organization on behalf of the Pennsylvania State Police
investigation.  However, the Third Circuit directly addressed
this argument and found that this information was not material.
Id. at 180.  The panel reasoned that although Serviolo had been
invited to join the Breed, he declined and thus "would not have
access to more details about the organization's operations."  Id.
at 180.  The panel went on to note that even if "Serviolo [had]
been willing to infiltrate the Breed, that would not have
necessarily negated the necessity for obtaining wiretaps in this
case."  Id. at 180. The panel explained that as a new member,
Serviolo would have had "lowly" status that would have
significantly lessened any usefulness of the infiltration.  Id.
at n.18.

Napoli's argument regarding Schwartz's alleged
misrepresentations in his wiretap application affidavit also
includes his contention that Schwartz referred to Robert
Traverse, who was suspected of engaging in drug transactions with
Johnson, as Bob LNU (last name unknown) in the affidavit but
identified him with his last name two weeks earlier.  The form in
which Schwartz identifies Traverse is a wiretap transcript cover
that contains the date of a phone call that took place two weeks
before the date Napoli's wiretap began.  There is no proof,
however, that Schwartz created this form on that date.  He may
have created it much later, after Traverse's full name was known,

when he was going back through the transcripts to create cover sheets.

Napoli also asserts that in his affidavit Schwartz materially misrepresented Traverse's job by stating he was merely related to methamphetamine trafficking, whereas in his grand jury testimony Schwartz more explicitly stated that he believed Traverse was Johnson's supplier.  Specifically, in the affidavit Schwartz stated, "[y]our Affiant believes that Bob's 'job' is related to methamphetamine trafficking."  Similarly, in the grand jury testimony, Schwartz responded to the question, "[w]hat pattern did you see develop," with the answer, "[f]irst and foremost, we believed that Johnson was obtaining the crystal methamphetamine from an individual named Robert Traverse."  We find that any difference in this language does not amount to a material misrepresentation warranting a <u>Franks</u> hearing, and accordingly no prejudice occurred.  <u>Strickland</u>, 466 U.S. at 694

Napoli noted that his trial counsel failed to argue that the wiretap application contained contradictory statements and was steeped in Schwartz's opinions and beliefs rather than facts.  Napoli contends Schwartz was contradictory because he stated that wiretaps were "the only way to fully identify [Napoli's] methamphetamine organization," but he also stated that Napoli and Johnson were cryptic and guarded over the telephone. This is not a contradiction.  Targets of wiretap investigations are frequently cryptic, but agents are trained to learn the code of such cryptic conversations and extract relevant evidence.

-26-

In sum, none of the arguments Napoli makes with respect to the wiretap application has any merit.  The <u>Strickland</u> standard for ineffective assistance of counsel totally fails.

Napoli next contends that the government failed timely to disclose Jencks material, thus rendering his trial counsel ineffective.  Jencks material refers to prior statements of government witnesses that must be provided to defendants after the witnesses testify on direct.  18 U.S.C. § 3500(b).[2]  Napoli specifically claims that the government did not provide his attorney with handwritten notes that were statements of Schwartz prior to his testimony.  According to Napoli, these notes would have contradicted Schwartz's affidavit by showing that Serviolo could have infiltrated the Breed, making the wiretap unnecessary.  First, as discussed above, there is no evidence that Serviolo could have infiltrated the Breed.  He would have been a new member, not privy to the inner workings of the group such that the wiretaps would have been rendered unnecessary.  In addition, our Court of Appeals also addressed and rejected this argument on Napoli's direct appeal.  <u>See</u> <u>Heilman</u>, 377 F. App'x at 194-98.

---

2.  Section 3500(b) provides:  "After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified. If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use."

Napoli further contends that his trial counsel failed to object to hearsay on constitutional grounds when Agent Schwartz testified to statements from non-testifying coconspirators.  Napoli does not describe any specific statements that were impermissible hearsay, and we do not find any in the record.  Accordingly, this claim is without merit.

Napoli alleges that his trial counsel was ineffective because they failed to object to the admission of prejudicial evidence of other bad acts, including threats, violence, weapons, explosives, arson, and extortion, in violation of Rule 404(b) of the Federal Rules of Evidence.  Specifically, Napoli maintains that his trial counsel failed to object to testimony regarding the defendants' stealing motorcycle parts, possessing explosives, keeping brass knuckles and dynamite sticks, beating of club members, whipping club members with belts, stealing from club members, participating in bar fights, disrespecting law enforcement, attempting to extort other business, burning a Christmas tree, and requiring neighborhood tattoo businesses to pay him as a condition of doing business.  Rule 404(b) provides that "[e]vidence of a crime, wrong, or other act" may be admissible to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  Fed. R. Evid. 404(b).  This Rule also provides that "[o]n request by a defendant in a criminal case, the prosecutor must ... provide reasonable notice of the general nature of any such evidence that the prosecutor intends to offer at trial.

Here, the government provided such notice in a memorandum of law on August 14, 2007.

Evidence of uncharged crimes may be introduced and is not subject to Rule 404(b) if it goes toward proving elements of the crimes actually charged against such defendant. United States v. Eufrasio, 935 F. 2d 553, 572-73 (3d Cir. 1991); see also United States v. Terrence Gibbs, 190 F.3d 188, 217 (3d Cir. 1999). Similarly, "Rule 404(b) does not limit the admission of evidence of the defendant's participation in acts of violence as direct proof of a conspiracy." Terrence Gibbs, 190 F.3d at 218.

Here, the evidence to which Napoli refers was introduced as proof of the extortion, conspiracy, and VICAR counts. The burnt Christmas tree photographs to which Napoli objects were introduced as evidence of the fire at Grady's home that occurred after Napoli threatened to set Grady on fire if Grady failed to pay Napoli $25,000. This was proof of extortion for Count V. The evidence to which Napoli points of the defendants being disrespectful to police officers was also part of the evidence involving the extortion count. Officer Thomas Phillips, an officer with the Bristol Township Police Department, testified about his response to an incident at Grady's residence because someone called him about Napoli attempting to break into the home. He described how he saw damage to the front door and Napoli out in the street. He stated that Napoli gave him the finger and made a "motion to kiss his ass." This evidence was relevant proof of the extortion charge.

-29-

The evidence of stolen motorcycle parts, brass knuckles, and explosives was introduced when the government asked Agent Schwartz what he seized as a result of executing search warrants as part of his investigation.  This evidence did not unfairly prejudice Napoli but rather went toward proving the conspiracy and VICAR counts.  Similarly, any evidence of beating club members and attempting to extort other businesses was germane to the VICAR counts.

Napoli argues that his trial counsel failed to challenge the admissibility of tape recordings which the government introduced as coconspirator statements allowable under Rule 801(d)(2)(E) of the Federal Rules of Evidence.  He claims that the statements were not a part of the conspiracy or in furtherance of the conspiracy.  Under Rule 801(d)(2)(E), a statement is not hearsay if it "was made by the party's coconspirator during and in furtherance of the conspiracy."  Fed. R. Evid. 801(d)(2)(E).  Before a statement may be admitted under Rule 801(d)(2)(E), three requirements must be satisfied.  United States v. Stephen Gibbs, 739 F.2d 838, 843 (3d Cir. 1984) (citations omitted).  First, there must be independent evidence establishing that the person against whom the statement is offered participated in the conspiracy.  Second, the statement must have been made in furtherance of the conspiracy.  Third, the statement must have been made during the life of the conspiracy. Id.

Coconspirator statements may be admitted over an objection that they do not meet these requirements of Rule 801(d)(2)(E) only upon a showing by a preponderance of the evidence that these requirements have been satisfied. <u>Bourjaily v. United States</u>, 483 U.S. 171, 175 (1987). Napoli contends there was no independent evidence that he participated in the conspiracy and that his counsel was ineffective by not objecting to the admission of the tape recordings on this basis. This is incorrect. Numerous coconspirators planned to and did testify at trial about the conspiracy. These tape recordings were clearly admissible since independent evidence of conspiracy existed.

Napoli also contends that many of the tape recorded conversations introduced at trial were not in furtherance of the conspiracy, and rather were "mere idle chatter." The in-furtherance requirement is broadly interpreted. <u>Stephen Gibbs</u>, 739 F.2d at 845 (citations omitted). Statements made to individuals who are not involved in the conspiracy are not in furtherance of it, nor are casual conversations between coconspirators that are not intended to advance the conspiracy. <u>Id.</u> (citations omitted). However, statements made among coconspirators to keep each other informed about the progress of the conspiracy do satisfy the in-furtherance requirement. <u>Id.</u> (citations omitted). Napoli does not point to specific statements in the record that were not made in furtherance of the conspiracy, and we have not found any that fall into this

category.  Any objection to the admissibility of the tape
recordings under Rule 801(d)(2)(E) would have failed.

Napoli submits that the government was unable to
identify the speakers of the tape recorded conversations through
credible evidence.  Again, Napoli is wrong.  Agent Schwartz
testified as to the names and identities of each person on the
tape recordings.  Schwartz explained at trial how he was able to
identify voices: "Oftentimes people will identify themselves on
the telephone.  They'll - when they call somebody they'll say hey
it's Billy, hey, it's Junior, hey, it's John.  It - it'll come
down to voice recognition, after you listen to their calls
several hundred times.  You know, oftentimes, from voice
recognition, who the person is.  In the case of Mr. Napoli, his
cell phone was subscribed in his name."  This was sufficient
foundation.  The lack of any objection by Napoli's counsel does
not violate <u>Strickland</u>.

Napoli further argues that Eric Loebsack, one of the
government's cooperating witnesses and a coconspirator, was
unable to identify people in the tape recorded phone calls
introduced by the government.  This tape described by Napoli was
not introduced by the government but rather by one of the co-
defendants during cross-examination of Loebsack.  The claim
accordingly fails.

Another ground for relief pursued by Napoli is that his
trial counsel was ineffective for failing to challenge the
admission of the tape recordings and transcripts as more

-32-

prejudicial than probative under Rule 403 of the Federal Rules of Evidence because of the offensive and derogatory language against women and African Americans that was used throughout the recordings.  Napoli is correct that the tape recorded conversations were riddled with expletives.  However, admission of taped conversations containing expletives, including racial epithets, is not improper when "it would have been virtually impossible to redact this or the other conversations without altering their substance."  United States v. Price, 13 F.3d 711, 720 (3d Cir. 1994).  That would have been the case here.  Any objection by his counsel would have been overruled.

Napoli contends a Strickland violation occurred because his trial counsel did not request a hearing under United States v. Starks, 515 F.2d 112, 121 (3d Cir. 1975) to challenge the admissibility of the tape recordings for being inaudible or barely audible.  Napoli bases his contention that the recordings were inaudible on the fact that some of the transcript stated that certain parts of the recordings were "indiscernible."

However, the transcripts of this trial generally do not provide the content of the tape recorded calls.  Instead, the transcribers wrote "audio played" when one of the recordings was played in the courtroom.  That said, occasionally the transcriber attempted to transcribe the content of audio calls from the recordings.  Some of the words were "indiscernible" when the transcriber attempted to do this.  This does not demonstrate that the tapes were inaudible in the courtroom.  Transcribers do not

attempt to transcribe testimony while in the courtroom but rather
listen to recordings of trials outside of the courtroom after the
conclusion of proceedings.  Here, the transcriber would have thus
been listening to a recording of a recording, and as a result the
sound quality would have been worse than it actually was in the
courtroom.  The fact that these recordings of recordings were
occasionally "indiscernible" to the transcriber does not
establish that the recordings were inaudible when played in the
courtroom.

Napoli further argues that his attorneys "failed to
even prepare the defense version of the transcripts which
accurately reflect the unintelligible portions of the
conversations."  It is not clear to what Napoli is referring
here, and Napoli does not provide the court with any defense
version of the transcripts.  Accordingly this argument fails.
Napoli also maintains that a Starks hearing would have revealed
that witnesses were unable to identify speakers on the tape
recordings presented by the government, but as discussed above
witnesses were properly identified.

Another argument that Napoli raises concerning the
ineffectiveness of his trial attorneys was their failure to
object to the government's opening statements regarding the
guilty pleas of non-testifying co-defendants.  Napoli asserts
that the government made repeated references to the guilty pleas
of Kenneth Steinmuller and James Fostinis, two of Napoli's co-
defendants who did not testify at trial.  Under Bruton v. United

-34-

States, the admission of a confession of a non-testifying co-defendant inculpating a defendant being tried violates the Confrontation Clause rights of that defendant.  391 U.S. 123, 126 (1968).  No Sixth Amendment violation occurred under Bruton because the guilty pleas of Napoli's non-testifying co-defendants did not inculpate Napoli. Moreover, the guilty pleas were only mentioned in the opening statement and never introduced as evidence.  The court made it clear in its preliminary instructions to the jury that the opening statement was not evidence.  No Sixth Amendment violation occurred.

Napoli's next argument is that his trial attorneys were ineffective because they entered into stipulations as to evidence of certain elements of some offenses.  Napoli emphasizes that his counsel entered into stipulations without informing Napoli or getting his consent.  According to Napoli, his counsel was ineffective in stipulating to the drug identity for the conspiracy to distribute methamphetamine charge and to the interstate commerce element of the firearm charges.  Stipulations are a matter of trial strategy and as a result are entitled to deference.  When used correctly, stipulations allow counsel "to avoid senselessly lengthening a trial or drawing attention to issues harmful to a party."  United States v. Shabazz, No. 06-710-01, 2011 WL 2453496, at *4 (E.D. Pa. June 20, 2011).

Napoli is correct that certain stipulations require the defendant's express consent, but none of the stipulations involved here do.  Those requiring express consent are taking a

guilty plea, waiving a jury, testifying at trial, and appealing a conviction. Jones v. Barnes, 463 U.S. 745, 751 (1983). The stipulations Napoli references regarding drug analysis and interstate nexus evidence are among the many tactical decisions left to the judgment of trial counsel. See id. at 753 n.6. Napoli's counsel, Jack McMahon, testified at the evidentiary hearing that he discussed all stipulations with Napoli. We believe McMahon. McMahon stated that they were sound trial strategy because Napoli's defense was not that the substances found were not methamphetamine. In any event, the government's chemist was in the hallway at the time of trial, ready to testify to the nature of the substances. Significantly, Napoli does not claim that the stipulated drug analysis or interstate nexus evidence was inaccurate and thus does not allege any prejudice.

Napoli submits that his trial attorneys failed to object to the court's denial of the jury's request to read the transcripts of the tape recordings during deliberations. At trial, a court "has broad discretion in deciding whether to accede to a jury's request for a reading of testimony." United States v. Zarintash, 736 F.2d 66, 69-70 (3d Cir. 1984). The court may decline to read back testimony where: (1) the request would slow the trial because the testimony at issue is lengthy; or (2) there is a danger that the jury may give undue weight to the testimony. United States v. Bertoli, 40 F.3d 1384, 1400 (3d Cir. 1994). Napoli contends that the court's refusal was not based on either of these two bases because the court told the

-36-

jury, "those transcripts are not available and you're going to have to use your recollection as to what was said here during trial." The jury's request would have required playing back multiple days of testimony and would have thus significantly slowed the trial. The court properly made the decision, within its discretion, to avoid significant delay in an already lengthy trial. It was not obligated to explain to the jury the <u>Bertoli</u> analysis.

   In his list of arguments, Napoli maintains that his trial counsel was ineffective for failing to dispute the extra security measures put in place. These measures included an anonymous jury and partial sequestration of the jury, as well as sequestered lunches and breaks and transportation by the U.S. Marshals Service of jurors to and from a central location to court each day. Napoli was also physically restrained by foot shackles which were obscured from jury view by a curtain around the defense table.

   The government requested these measures by motions filed on September 10, 2007 and September 14, 2007, respectively. These security measures were requested because of evidence of prior threats made by Napoli and other Breed members against law enforcement, including Napoli's yelling at the state agents who testified at the pretrial hearings. On September 12, 2007, the court held a telephone conference with counsel in which counsel had the opportunity to argue orally against the motion for an anonymous and partially sequestered jury. Then, on September 18,

2007, prior to jury selection, all defense counsel argued against the motion to restrain the defendants, and the court granted the motion over the defendants' objections.  Accordingly, since Napoli's counsel objected, no ineffective assistance of counsel occurred.

Napoli alleges that his trial counsel failed to object to the discharge of a juror in the middle of the trial or request that the court give curative instructions to the other members of the jury.  Napoli contends that the remaining jurors may have assumed the Breed was responsible for the juror's abduction or disappearance.  Napoli misrepresents the record.  His counsel did object to the discharge of the juror, and the court overruled the objection.  The reason the juror was discharged was his failure to appear at the rendezvous point where the deputy marshals met the anonymous members of the jury to escort them to the courthouse.  The deputy marshals waited an additional half hour and the juror did not appear.  Additionally, they called the juror's home phone number and cell phone number and the number of the juror's sister, which the juror had provided, and there was no answer at any of those numbers.  Thus, the court discharged the juror and replaced him with an alternate so as not to delay the trial.  A discussion of this incident, including the objection of Napoli's counsel, occurred on the record outside the presence of the jury.  No prejudice occurred.  Strickland, 466 U.S. at 694.

Napoli next contends that his trial counsel was ineffective for failing to object to documents that the government introduced as business records under Rule 803(6) of the Federal Rules of Evidence. The records were taken from his computer, from Grady's computer, and a "suspicious activity report" made by a bank employee. Rule 803(6) at the time of trial[3] provided for an exception for the hearsay rule for:

> A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness, or by certification that complies with Rule 902(11), Rule 902(12), or a statute permitting certification, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

Fed. R. Evid. 803(6) (as in effect at the time of trial).

The reason the government introduced documents taken from Napoli's and Grady's computers was to show that the amount of legitimate construction business conducted by Napoli did not justify the cash seized from him. The documents from Grady's computer were accounting records for Napoli and Grady's

---

3. The Federal Rules of Evidence were restyled in 2011. Napoli's trial occurred in 2007.

construction business.  They were introduced by the author of the
documents, Anne Marie Doyle, who was Grady's girlfriend and an
accountant for the construction company.  Napoli is correct that
the government did not specifically go through the elements of
Rule 803(6) with Doyle.  However, these documents do fall within
the business records exception because Doyle had knowledge of the
company's business, it was her regular practice to create the
documents, and she kept them in the course of regularly conducted
business.  Moreover, even if Napoli's attorneys should have
challenged the introduction of these documents, the government
could have then used the documents to refresh Doyle's
recollection of the accounting she performed.  See Fed. R. Evid.
612.  Significantly, there was overwhelming evidence that the
cash in Napoli's possession did not come from a legitimate source
of business.  Accordingly, Napoli was not prejudiced under
Strickland.  466 U.S. at 694.

        Able Rios ("Rios"), a special agent with the computer
forensics unit of the Pennsylvania Attorney General's office,
testified about the documents from Napoli's computer.  Rios
examined Napoli's computer after it was seized pursuant to a
search warrant.  One of his tasks was to determine whether there
were any business records on the computer having to do with
Napoli's construction company.  He testified as to what was
contained in various documents.  These records were not
introduced "for the truth of the matter asserted" and thus do not
fall within the definition of hearsay under Rule 801 of the

Federal Rules of Evidence.  The purpose of introducing these
documents was to show that Napoli maintained hardly any records
of his construction business.  There were only three documents on
the computer related to the construction business.  Accordingly,
the records were not hearsay.  See Fed. R. Evid. 801.

Napoli also objects to a "suspicious activity report"
on Confrontation Clause grounds.  These types of reports are
documents made by banks when individuals make cash transactions
close to $10,000.  In this instance, the Citizens Bank employee
who created the report, which he called a "suspicious transaction
document," prepared it because of a withdrawal from Napoli's
account of $9,500.  The employee was called to testify about this
transaction and a few other changes in the balance of Napoli's
bank account.  The report was provided to the employee but only
to refresh his recollection of Napoli's transaction and was not
introduced into evidence.  Napoli's Confrontation Clause rights
under the Sixth Amendment were not violated, and no hearsay was
introduced.  Furthermore, Napoli's counsel objected following the
employee's reference to the "suspicious transaction document,"
but the court still allowed the government to use it to refresh
the employee's recollection.  No ineffective assistance under
Strickland occurred.

Napoli further alleges that his trial counsel did not
challenge expert testimony of ion-scan tests showing
methamphetamine on currency found from the defendants.  Napoli
contends that "it was an error to convey to the jury that just

-41-

because the currency had trace levels of methamphetamine, Napoli was involved in trafficking [sic] of methamphetamine." According to Napoli, a significant amount of United States currency has traces of controlled substances on it. Napoli cites cases regarding forfeiture of money found by trained dogs to be contaminated with cocaine rather than cases involving the introduction of evidence at trial of money found by ion-scan technology to be contaminated with methamphetamine. See United States v. Fifty-Three Thousand Eighty-Two Dollars in United States Currency, 985 F.2d 245 (6th Cir. 1993); United States v. Six Hundred Thirty-Nine Thousand Five Hundred & Fifty-Eight Dollars in United States Currency, 955 F.2d 712 (D.C. Cir. 1992); United States v. $80,760.00 in U.S. Currency, 781 F. Supp. 462 (N.D. Tex. 1991); United States v. $87,375 in United States Currency, 727 F. Supp. 155 (D.N.J. 1989). None of these cases is relevant to Napoli's argument.

Courts which have addressed whether to admit ion-scan evidence indicating traces of drug residue on currency have found this evidence to be admissible. See, e.g., United States v. Hairston, 409 F. App'x 668, 671 (4th Cir. 2011); United States v. Hernandez-De La Rosa, 606 F. Supp. 2d 175, 189 (D.P.R. 2009); Munoz v. United States, 2008 U.S. Dist. LEXIS 57326, at *190-202 (E.D.N.Y. July 28, 2008). Moreover, in this case Sergeant Pueyes, the ion scan coordinator at the Pennsylvania Army National Guard Counterdrug Program, testified extensively about the operation of ion-scan technology, his training to operate the

technology, the protocols he employed for reliable results, and
the methodology he used in testing the cash involved in the case.
He testified that it is "definitely rare" to find methamphetamine
on United States currency.  In addition, Napoli's trial counsel
cross-examined Sergeant Pueyes extensively on the operation of
the ion-scan technology and the methodology he used.  He
specifically asked questions about how rare it is for
methamphetamine residue to be on currency.  There was no
ineffective assistance of counsel.

      Napoli asserts that his trial counsel failed to object
to the introduction by the government of Napoli's non-payment of
taxes as an indication of involvement in illegal activity.  It is
well-established law in drug trafficking prosecutions that
evidence of a defendant's non-filing of tax returns is admissible
as circumstantial evidence tending to show that the defendant
possessed a large amount of cash without a legitimate source.
See United States v. Chandler, 326 F.3d 210, 215 (3d Cir. 2003);
see also United States v. Cooley, 131 F. App'x 881, 883 (3d Cir.
2005).  Under Rule 403 of the Federal Rules of Evidence, however,
relevant evidence "may be excluded if its probative value is
substantially outweighed by the danger of unfair prejudice,
confusion of the issues, or misleading the jury."  In this case,
the probative value of evidence that Napoli did not file tax
returns exceeded any unfair prejudice.  The government sought to
show that the approximately $224,000 in unexplained cash proceeds
belonging to Napoli and seized by law enforcement were illegal

-43-

proceeds from drug trafficking.  Indeed, "[c]ourts of appeals consistently have upheld the admissibility of such evidence when it reasonably supports the government's assertion that the defendant possessed substantial cash not obtained through legitimate means."  Chandler, 326 F.3d at 215.  This evidence was probative, and any objection by Napoli's counsel would have failed.

        Napoli next raises the issue that his trial attorneys were ineffective because they failed to object to certificates of nonexistence of tax records which were introduced by the government.  Napoli argues his counsel failed to make an objection under Melendez-Diaz v. Massachusetts, 129 S. Ct. 2527 (2009), which was decided after his trial.  Under this decision, a certification of nonexistence of a record which "would serve as substantive evidence against the defendant whose guilt depended on the nonexistence of the record for which the clerk searched" is subject to the Confrontation Clause.  Id. at 2539.  Indeed, our Court of Appeals has held that the introduction of a certificate of nonexistence of a record violated the Confrontation Clause where the defendant did not have the ability to confront the person who prepared the document.  Gov't of Virgin Islands v. Gumbs, 426 F. App'x 90, 91 (3d Cir. 2011) (not precedential).  Napoli's trial attorneys were not ineffective for not objecting to the introduction of this evidence because the law on this issue was not clear until the ruling in Melendez-Diaz by the Supreme Court in 2009.  Ineffective assistance of counsel

-44-

is judged by "an objective standard of reasonableness, viewed to
the extent possible from the attorney's perspective at the time,
without 'the distorting effects of hindsight.'"  Duncan v.
Morton, 256 F.3d 189, 200 (3d Cir. 2001) (citing Strickland, 466
U.S. at 688-90).  Furthermore, "in making litigation decisions,
there is no general duty on the part of defense counsel to
anticipate changes in the law."  Id. (citations omitted).

        Even if this same issue arose today, the certification
would have been admissible under United States v. Okorie, 425 F.
App'x 166, 170 (3d Cir. 2011) (not precedential).  In that case,
the court upheld the admission of a report containing the results
of employment-records searches to show that the defendant had
never worked for certain agencies.  The defendant objected that
the people who actually performed the searches of the records did
not testify, but rather their supervisors testified.  Our Court
of Appeals found that the Confrontation Clause was not violated
where the witnesses "had knowledge of their institutions'
records, the searches conducted, and their results, and both were
subject to cross-examination on these issues" even though the
witnesses were not the individuals who actually performed the
searches.  Id. at 170.  Similarly, here the certifications were
introduced by a records custodian, IRS Agent Ken Kelly, which
would satisfy the standard under Okorie.

        Napoli additionally argues that his trial counsel
failed to file a motion for suppression of the evidence,
including a computer and its contents, obtained from Napoli's

home.  Napoli contends that many items were seized which were not
listed on the warrant.  These items include Napoli's vehicles,
safe deposit keys, guns belonging to and registered to his
girlfriend, a computer, and a money counter.  Napoli is
incorrect.  His counsel did file a suppression motion for the
physical evidence taken from his home, and the motion was denied
by the court following a hearing.  Although Napoli's counsel did
not succeed on his motion, he was not ineffective as he did file
it.

Next, Napoli alleges that his trial counsel was
ineffective in failing to object to the government having two
testifying agents at its counsel table.  This claim has no merit.
First, Napoli does not point to anything in the record to support
this claim.  Moreover, although Rule 615 of the Federal Rules of
Evidence requires a district court to order sequestration of a
witness upon a party's request, our Court of Appeals explained
that even with multiple agents in the courtroom, the possibility
that "agents could coordinate their testimony does not pose a
likelihood of prejudice since they had ample time before trial to
do that, were they so inclined."  United States v. Gonzalez, 918
F.2d 1129, 1137 & n.8 (3d Cir. 1990); Fed. R. Evid. 615.

Napoli also argues that his trial counsel failed to
challenge the government's evidence as legally insufficient due
to a failure to prove essential elements of the crimes charged.
Specifically, he maintains that the government produced
insufficient evidence of the existence of an "enterprise" and of

-46-

the alleged "maintaining or increasing position in" such an
enterprise under the VICAR statute.  Napoli further argues that
the evidence was insufficient to prove collection of credit by
extortionate means in violation of 18 U.S.C. § 894.  These
arguments were raised by Napoli's trial attorneys in a motion
under Rule 29 of the Federal Rules of Criminal Procedure.  The
court held argument on this motion and denied it.  This decision
was affirmed by our Court of Appeals.  Napoli's attorneys may not
have been successful, but they were not ineffective.

Napoli then alleges that his trial counsel erred by
failing to object to the government providing copies of the grand
jury transcripts to testifying witnesses and coaching them "to
make up stories in [the] government's favor."  This argument is
without merit.  Napoli points to instances during the trial when
witnesses said that they had previously met with the government
and that they had listened to the wiretap tapes before getting on
the stand.  This is proper trial preparation.  As Napoli
concedes, attorneys regularly interview witnesses before trial
and discuss testimony with them.  See United States v. Ash, 413
U.S. 300, 318 (1973); Geders v. United States, 425 U.S. 80, 91
n.3 (1976).  Napoli has produced no evidence that anything
improper occurred, and we find there was no ineffective
assistance of counsel in this regard.

Napoli contends that his trial counsel failed to object
to the government's vouching for its witnesses' veracity in its
closing argument.  "Vouching constitutes an assurance by the

-47-

prosecuting attorney of the credibility of a Government witness through personal knowledge or by other information outside of the testimony before the jury." United States v. Walker, 155 F.3d 180, 184 (3d Cir. 1998) (citing United States v. Lawn, 355 U.S. 339, 359 n.15 (1958)). Two criteria must be met to find vouching:  "(1) the prosecutor must assure the jury that the testimony of a Government witness is credible; and (2) this assurance is based on either the prosecutor's personal knowledge, or other information not contained in the record." Id. at 187. Based on these criteria, vouching has not occurred if the prosecutor merely assures a jury that a witness' testimony was credible.  Id.  Rather, "[t]he defendant must be able to identify as the basis for that comment an explicit or implicit reference to either the personal knowledge of the prosecuting attorney or information not contained in the record." Id. (citing Lawn, 355 U.S. at 359 n.15).

Napoli points to two specific instances in the government's closing argument, specifically during its rebuttal, when he believes vouching occurred.  In the first, the government argued as follows:  "They're insulting to the good agents who have worked very hard to make this case and to all the efforts and indications that they have made..."  In the second, the government stated about the cooperating coconspirators:

> I suggest to you that there is no motivation
> for them other than to tell you the truth,
> because it is no easy task for them to come
> in and do so.  They've had to face these
> defendants who have brutalized other people.

-48-

> They've had to face the community.  They've
> had to face spectators.  It's a frightening
> prospect to do that.  And they've given up a
> lot for the process.  They have not
> benefitted in any way.  And the ones who are
> going to jail, and they're cooperating, it is
> – there's nothing wrong with them expecting
> that someone from the government will tell
> the sentencing judge what they're doing.
> Because they've admitted their guilt.
> They're not on trial here.  They've admitted
> their guilt.  They're trying to make amends.

As noted above, these statements were not made in the

government's opening statement but in response to statements of

the defense attorneys in their closing arguments that the

prosecution witnesses were lying and not credible.  For example,

Napoli's counsel argued that the cooperating witnesses would

> say Jack McMahon [defense counsel] was
> selling methamphetamine if, in fact, that
> could have got them out of their situation.
> Their mother, their brother, everyone.  It
> doesn't matter.  'Cause it's all about
> themselves.  And when you have all of that
> power and you have one focus, to get John
> Napoli, and you have all of that power of the
> government, it's pretty easy.

His counsel further stated, "people can sit on those witness

stands and say anything they want.  I've learned that over all

these years."  Our Court of Appeals has explained that "in

analyzing the effect of the prosecutor's remarks on the outcome

of the trial, courts will consider the 'invited response' or

'invited reply' rule, i.e., whether 'defense counsel's comments

clearly invited the reply.'"  Werts v. Vaughn, 228 F.3d 178, 199

(3d Cir. 2000) (quoting United States v. Young, 470 U.S. 1, 8 &

10 (1985)).  Here, defense counsel's comments invited the

-49-

prosecutor's remarks.  Napoli's constitutional rights were not violated.

Further, Napoli argues that his trial counsel did not challenge defective jury instructions.  Napoli first asserts that the court permitted the jury to find Napoli guilty by reason of a conspiracy liability for the VICAR counts and mandated a finding of the interstate commerce element of the VICAR counts.  Napoli's arguments fail.  Our Court of Appeals affirmed this instruction in Heilman, 377 F. App'x at 206.  Although Napoli claimed a different error in the instruction on appeal, our Court of Appeals agreed with the government that the district court "correctly summarized the state of the law and committed no error."

In addition, Napoli asserts that the court wrongly told the jury that Napoli was a convicted felon.  It is true that the court accidentally misspoke and included the phrase "possessed by a convicted felon" when it was reading the firearms charge, even though the defendant had waived a jury finding of that element.  After the court read the charge, counsel came to sidebar and all parties advised the court of this mistake.  The court recommended and all counsel agreed that less attention would be drawn to the mistake if no oral correction was made, but instead the mistake was corrected on the written charge that was given to the jury.  Napoli was not prejudiced by this one phrase contained within a long charge because the government had not presented any evidence

-50-

to the jury about Napoli's criminal status.  <u>Strickland</u>, 466 U.S.
at 694.

Napoli also contends that the court improperly
instructed the jury with respect to Count V, collection of credit
by extortionate means, a violation of 18 U.S.C. § 894.  In
providing instructions to the jury on that count, the court
stated:

> The term "debtor" with reference to any given
> extension of credit refers to any person to
> whom that extension of credit is made or to
> any person who guarantees the repayment of
> that extension of credit or in any matter
> undertakes to indemnify the creditor against
> loss resulting from the failure or any person
> to who m that extension of credit is made to
> repay the same.  The term "debtor" includes a
> person who borrows or owes money or who
> receives something else of value for which he
> or she is expected to make repayment.  As
> used in these instructions, someone who
> guarantees the repayment of the loan may also
> be considered to be a debtor.

Later, the instructions referred to Grady as the "debtor,"
stating, "[a]ctually [sic] fear on the part of the debtor,
Jeffrey Grady, is not an element of the offense charged in Count
V of the indictment."  It is Napoli's position that this created
a mandatory presumption that Grady was the "debtor," thus
impinging on the jury's fact-finding duties, is without merit.
The court properly instructed the jury to determine whether:

> (1) John Napoli knowingly used to participate
> in or attempted the use of extortionate means
> to collect or attempt to collect an extension
> of credit or loan from Jeffrey Grady; and
> (2) in doing so, John Napoli expressly or
> implicitly threatened, ordered or attempted
> the use of violence or other criminal means

> to cause harm to Jeffrey Grady or the
> property of Jeffrey Grady.

Calling Grady the "debtor" caused no harm to Napoli. Napoli was thus not prejudiced by any failure of his counsel to object to this portion of the jury instructions on collection of credit by extortionate means.

Napoli further argues that the court gave an incorrect "two-inference" instruction on reasonable doubt. This instruction specifically was, "[i]f you view the evidence in the case as reasonably permitting either of two conclusions, one of innocence and the other of guilt, you must, of course, adopt the conclusion of innocence." Napoli is correct that this instruction has been rejected by our Court of Appeals. Our Court of Appeals has followed the Second Circuit in determining that "the 'two-inference' instruction is improper because it 'may mislead a jury into thinking that the government's burden is somehow less than proof beyond a reasonable doubt.'" United States v. Isaac, 134 F.3d 199, 203 (3d Cir. 1998) (internal citations and quotations omitted). However, in Isaac, the court explained that it "did not hold that the instruction was so constitutionally deficient per se that it infected the entire instruction on reasonable doubt." Id. As in Isaac, here the court's instructions "[a]s a whole ... adequately conveyed the government's burden of proof to the jury." Id. at 204. The court stated that the government was required to prove its case beyond a reasonable doubt and "accurately explained that the

-52-

standard was high, but not to the point of absolute certainty or
to the exclusion of possibilities which defy common sense." Id.
Accordingly, as in Isaac, we find that no prejudice occurred.

Napoli's next argument is that his counsel was
ineffective at sentencing because she failed to object to the
sentence even though it was in excess of the statutory maximum
for all counts.  Napoli concedes that the maximum sentence for
Count One, conspiracy to distribute and to possess with intent to
distribute methamphetamine, in violation of 18 U.S.C. § 846, was
life imprisonment since the jury found that 500 grams or more of
methamphetamine was involved in the conspiracy.  See 18 U.S.C.
§ 841.  Accordingly, since Napoli's sentence was imprisonment of
432 months, it was below the statutory maximum.

Nevertheless, Napoli claims that the court erred by
imposing a "general sentence" of imprisonment of 432 months on
all the counts of the indictment for which he was convicted,
rather than specifying an individual sentence for each offense.
Napoli is correct that our Court of Appeals held in United States
v. Ward, 626 F.3d 179, 184-85 (3d Cir. 2010) that a court commits
a plain error when it fails to impose a sentence on each count
and instead imposes a general sentence as to all counts so as to
prevent an adequate review of the sentence.  The appellate court
based its decision on § 5G1.2 of the Sentencing Guidelines, which
indicates that sentencing courts must impose a sentence on each
count.  See U.S.S.G. § 5G1.2(b).  However, Ward was handed down
over two years after Napoli's sentence was imposed.  See Duncan,

-53-

256 F.3d at 200.  In addition, the issue in Ward was decided on direct appeal while the issue here was raised for the first time on collateral review.  Napoli cannot establish prejudice under Strickland, since his sentence is below the maximum penalty on the conspiracy count, and there is no valid basis to challenge his conviction on that count.  Thus, regardless of all other counts, Napoli must serve a term of imprisonment of 432 months.  Any resentence on the other counts would now be a mere formality.

Napoli's final contention is that his trial counsel failed to request that a finding on the forfeiture amount be made by the jury instead of by the court.  Napoli's trial counsel, Jack McMahon, testified at the evidentiary hearing that he discussed this issue of forfeiture with Napoli and determined that he and Napoli would not subject the jury to determining a forfeiture sum.  The government agreed that Napoli would not have to forfeit his house if he did not insist on the issue of forfeiture going to the jury.  We find McMahon's testimony to be credible.  The decision to have the forfeiture finding made by the court was sound trial strategy and not ineffective assistance of counsel.

IV.

In sum, even if Napoli's counsel's performance was deficient in certain respects, Napoli has not established any prejudice, that is, "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Strickland, 466 U.S. at 694.  For

-54-

the above reasons, Napoli's motion under § 2255 will be denied.
A certificate of appealability will not issue.